Edward F. MARKELL
vs.
**STATE TAX COMMISSION**

Docket No. 99817

Appellate Tax Board
Commonwealth of Massachusetts

**January 26, 1983**

**Daniel C. Sacco, Esq., and Ronald B. Schwartz, Esq.,** counsels for the appellant.
**Peter J. Murphy, Esq.,** counsel for the appellee.

This is an appeal under the formal procedure pursuant to G.L. c. 62C, s. 39 from a refusal of the appellee to abate an income tax assessed under chapter 62C, s. 26 for the year 1975.

These findings of fact and report are made pursuant to a request by the appellant under the provisions of c. 58A, s. 13, as amended, and Rule 32 of the Rules of Practice and Procedure of the Appellate Tax Board.

### FINDINGS OF FACT & REPORT

The appellant, a resident of the commonwealth, filed a timely return with his spouse for calendar year 1975 in which he reported income as a ''securities investor'' on Schedule C. He listed as item 4 on that schedule dividends of $174,558 and claimed as deductions $2,250 for professional fees and $137,662 as interest

paid to the security brokers and an amount of $140 as a telephone expense. The appellee issued a Notice of Intention to Assess a deficiency tax dated 9/26/77 based on the assertion that the dividends were erroneously reported as 5% business income and no deduction for interest and other expenses should be allowed. On February 28, 1978, the commissioner actually assessed an additional tax of $15,019.98 plus interest and an additional tax for failure to estimate of $3,016.97, for a total of $18,036.95. The appellant's application for abatement filed on or about April 21, 1978 was denied by the appellee on July 13, 1978 and a timely appeal to this board was taken September 8, 1978.

Having reported the dividends and taken the deductions on Schedule C as noted above, the appellant reported the remainder of income in the amount of $34,546 as net profit from business or profession, item 21 on Schedule C, as item 12, page 1 of his 1975 income tax return. He reported no income from wages and salaries. His total 5% income, item 19, page 1, was $38,078, which included the balance of Massachusetts Savings Bank interest of $3,532. Exemptions of $3,800 left his total taxable 5% income of $34,278 resulting in a tax at 5% of $1,714. His total taxable 9% income was reported as $5,348 which represented a net amount after taking exclusions of $3,872 from security dividends received by his spouse and 9% interest totaling $9,220 which resulted in a tax at 9% of $481. Thus, his combined tax was reported as $2,195 to which was added a surtax of $165 resulting in a final tax of $2,360, shown on his return, Exhibit 1.

The appellant reported his security transactions quite differently on his federal return, Exhibit 2. In that return he did not file a Schedule C showing profit or loss from business or profession but reported the dividend income on Schedule B, "Dividend and Interest Income", and took a deduction for interest paid to brokers on Schedule A, "Itemized Deductions", item 19, while deductions for preparation of his tax return and the business telephone expense were taken under item 33 of Schedule A.

As to the nature and activity of the appellant in relation to his purchase and sale of securities, the board found the facts as agreed to by the parties, the salient features of which we summarize. Claiming the right to report his income as 5% income rather than 9% income and the right to take a deduction for interest and expenses on the ground that the appellant was engaged in a "trade or business", we advert to those activities which could possibly form the basis of a "trade or business."

In the conduct of his security transactions, the appellant maintained a desk at E.F. Hutton Company, Inc. and at Rothchild & Company, now known as L.F. Rothchild, Unterberg, Towbin. He was not employed by these companies and he paid no rent for the use of office space. The brokerage houses received compensation through the large volume of transactions done by the appellant through margin accounts and on which the firms earned interest income as well as brokerage commissions.

The appellant devoted his full-time to his dealings in securities and was not engaged in any other job or business. Based on his own observations of market actions of stock owned or under consideration for purchase and on the appellant's personal investigation of the pertinent factors affecting the industry and/or the particular company, including its past and anticipated performance, its assets and management, the appellant made his own decisions as to what purchases and sales he would make. He read the **Wall Street Journal** daily and would study the tear sheets of **Standard & Poor** describing the business operations, financial history and debt and equity structure of a company in which he contemplated an investment. He also regularly read business periodicals such as **Forbes** and **Business Week** and the annual and quarterly reports of all companies in

which he owned stock.

Exhibit 5 is a list of stocks he held in 1975 and Exhibit 6 is a resume of pertinent information concerning his portfolio for that year. He had 157 sell transactions involving 84,726 shares. His buy transactions numbered 269 involving 32,245 shares. The total value of shares sold was $1,997,505, while the total value of the shares bought was $2,423,666. Owning shares at some time during the year in 188 companies, the gross value of his holdings on December 31, 1975 was $4,312,056, while his equity value was $2,522,561. On January 1, 1975, the gross value was $3,832,945, while his equity value at that time was $2,683,170.

Neither the appellant nor any other witness testified in this case so that the board was unable to get answers to questions it had concerning the appellant's mode of activity and his reasonings and intentions with respect to his purchases and sales of securities. On the board's analysis of the limited facts with respect to appellant's activities concerning the management of his investment portfolio the board ruled that the appellant failed to introduce sufficient facts to prove he was engaged in a trade or business as that concept is applied under the code in our statute. The board further ruled that all the taxable income in question resulting from the appellant's investment activities was subject to tax at the rate of 9% and no deduction for expenses and interest should be allowed. Accordingly, a decision was rendered for the appellee.

## OPINION

The issues in this case are basically twofold: (1) Are dividends received by the appellant includable in Part A gross income or Part B gross income? (2) Was the appellant actively conducting a "trade or business", and thus, entitled to a deduction for expenses and interest?

The appellant reported his income from dividends on investments in his Part B gross income taxable at 5% as opposed to inclusion in his Part A gross income taxable at 9%.

M.G.L. c. 62, s. 2(a), defines Massachusetts gross income as federal gross income with modifications not here relevant. Chapter 62 as amended by St. 1973, c. 723, unlike the provisions of c. 62 as amended by St. 1971, c. 555, provides in section 2(b) for the immediate division of Massachusetts gross income, before determining adjusted gross income, into two classes: Part A gross income consisting of "total interest, dividends and net capital gain ...", again with exceptions not here relevant, and Part B gross income which is the remainder of Massachusetts gross income.

The division of these two types of income can be traced to our original income tax law St. 1916, c. 269. That statute provided in G.L. c. 62, s. 5(e) that interest and dividends taxable under s. 1 should not be taxed under s. 5 which imposed taxes on annuities, business income and net capital gain derived from intangibles. Business income consisted of net income from the profession, employment, trade or business and from transactions entered into for profit except the net income derived from intangible personal property.

St. 1971, c. 555 which made the major change in the nature[1] of our income tax from a tax on certain classes of income to a general income tax with a view to conforming our tax more closely to the Internal Revenue Code continued the policy of taxing income from interest and dividends at a higher rate. Thus, the practice of differentiating "earned" from "unearned" income and "business" from "non-business" income was early established and long continued in both Massachusetts tax law and the Internal Revenue Code (I.R.C.).

The recognition for the need of certain perfecting amendments[2] in St. 1971, c. 555, resulted in the enactment of M.G.L. c. 62 by St. 1973, c. 723. In addition to the

[1] **Barnes v. State Tax Commission**, 363 Mass. 589, 592, 593.

[2] **Barnes v. State Tax Commission**, 363 Mass. 589, 593. St. 1973, c. 723 also changed the law applicable to Barnes.

introduction of the new concept of Part A and Part B gross income,[3] c. 723 also took cognizance of the fact that Part A income taxable at the higher rate might be derived from a "trade or business." To allow for a deduction against such Part A income, c. 723 provided for the first time that any excess of deductions allowable to one conducting a trade or business over the amount of Part B gross income should be allowed as a deduction in computing Part A adjusted gross income to an amount not exceeding Part A adjusted gross income "effectively connected with the active conduct of a trade or business."

Thus, it is apparent that the legislature clearly contemplated that dividends whether arising out of the conduct of a trade or business or otherwise were to be taxed as Part A adjusted gross income and not under Part B adjusted gross income. A similar question was addressed and decided in **Barnes v. State Tax Commission**, 363 Mass., 589, where interest on loans made in the course of business by a loan company was held to be taxed at 9%.

The board concluded, then, that the appellant erroneously included his dividend income as Part B income and that his dividend income was taxable at 9%.

The second issue, with respect to whether or not the appellant was conducting a trade or business[4] and thus entitled to a deduction for expenses and interest, was more difficult of resolution and presented complicated questions of fact and law.

As stated in connection with our discussion of the first issue our statute distinguishes business income from non-business income and accords different deductions to the different types of income as does the I.R.C. Thus, special tax benefits are accorded business losses, business bad debts and business expenses[5] with lesser benefits or none at all to non-business losses, non-business bad debts and non-business expenses.

In general, the legislature has the authority to determine which deductions will be allowed and what might be perceived to be more equitable considerations are not always controlling. The general rule is that "deductions are a matter of legislative grace" and a taxpayer has the burden of justifying the allowance of any deduction claimed. **New Colonial Ice Company, Inc. v. Helvering**, 292, U.S. 435 (1934). **White v. U.S.**, 305, U.S. 281 (1938). In certain instances the taxpayer must look to Congress or the legislature to change a statute viewed by some to be inequitable. **Lykes v. U.S.**, 118, 121 (1952).

As for the problem as to if and when investment or other activities can be characterized as a "trade or business", the matter was visited by the U.S. Supreme Court in several cases notably in **Higgins v. Commissioner**, 312 U.S. 212 (1941) (Higgins) and **Whipple v. Commissioner**, 373 U.S. 193 (1963) (Whipple).

In the **Higgins** case, a taxpayer attempted to take deductions for salaries and other expenses connected with his investments in stocks and bonds under section 23A of the Revenue Act of 1932 as expenses paid or incurred in carrying on a "trade or business." Like the appellant in this appeal before us, Higgins was engaged in very extensive investments in stocks and bonds and "devoted a considerable portion of his time to the oversight of his interests and hired others to assist him in offices rented for the purpose." Section 23A of that code provided for a deduction for "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business." This is the same law as applicable to the appellant here.[6] There was no question but that the deductions were ordinary and necessary expenses. Higgins, who conducted his financial affairs in a New York office "pursuant to his personal

---

[3] G.L. c. 62, s. 2(1).
[4] G.L. c. 62, s. 1(1) "'trade or business' shall have the same meaning as in s. 62 of the code."
[5] I.R.C. ss. 162, 165, 166.
[6] I.R.C. s. 162.

detailed instructions,'' resided in Paris, France, where he had a second office. "By cable, telephone and mail, petitioner kept a watchful eye over his securities. While he sought permanent investments, redemptions, maturities and accumulations caused limited shiftings in his portfolio. These were made under his own orders. The office kept records, received securities, interest and dividend checks, made deposits, forwarded weekly and annual reports and undertook generally the care of the investments as instructed by the owner. Purchases were made by a financial institution ... The method of handling his affairs under consideration had been employed by the petitioner for more than thirty years. No objection to deductions had previously been made by the government.''

Higgins argued that the size, volume and complexity of his activity as distinguished from the ordinary investor was ''carrying on business.'' The government argued that ''mere personal investment activities never constitute carrying on a trade or business no matter how much of one's time or one's employees' time they may occupy.'' The court stated at page 217 and 218, ''To determine whether the activities of a taxpayer are 'carrying on a business' requires an examination of the facts in each case. As the Circuit Court of Appeals observed, all expenses of every business transaction are not deductible. Only those are deductible which relate to carrying on a business ... The petitioner merely kept records and collected interest and dividends from his securities, through managerial attention for his investments. No matter how large the estate or how continuous or extended the work required may be, such facts are not such as a matter of law to permit the court to reverse the decision of the board. Its conclusion is adequately supported by this record, and rests upon a conception of carrying on business similar to that expressed by this court for an antecedent section.''

The perceived undesirability of the result reached in **Higgins** resulted in an amendment to the Internal Revenue Code. This matter is discussed in **Whipple.** In that case the taxpayer, who had organized, owned the controlling interest in and managed several business corporations, experienced a loss on a loan he made to pay off the creditors of one of his companies. He attempted to take a deduction for a business bad debt in computing his 1953 taxable income. The commissioner claimed that the loan resulted in a non-business bad debt and assessed deficiencies. The Tax Court found that the taxpayer was not in the business of organizing, promoting, managing or financing corporations and the Court of Appeals affirmed. The Supreme Court said at page 195: ''The question before us is whether petitioner's activities in connection with several corporations in which he holds controlling interests can themselves be characterized as a trade or business so as to permit a debt owed by one of the corporations to him to be treated within the general rule of section 23(k) (1) as a 'business' rather than a 'non-business' bad debt.''

That Court said at page 197: ''The concept of engaging in a trade or business as distinguished from other activities pursued for profit is not new to the tax laws. As early as 1916, Congress, by providing for deductions of losses incurred in a trade or business separately from those sustained in other transactions entered into for profit, ... distinguished the broad range of income or profit producing activities from those satisfying the narrow category of trade or business. This pattern has been followed elsewhere in the code ... It is not surprising, therefore, that we approach the problem of applying that term here with much writing upon the slate.''

The Court referred to those provisions in the code concerning ''ordinary and necessary expenses,'' ''losses,'' ''depreciation,'' ''net operating loss deduction'' as all being related to the necessity for a finding that these items

were connected with a trade or business.

On page 200, of **Whipple,** the Court traced the development of this problem and the statute and stated "In response to the **Higgins** case and to give relief to Higgins-type taxpayers, see **H.R. Rep.** No. 2333, 77th Cong., 2d Sess. 46, Section 23(a) was amended[7] not by disturbing the court's definition of 'trade or business' but by following the pattern that had been established since 1916 of (enlarging) the category of incomes with reference to which expenses were deductible, **McDonald v. Commissioner,** 323 U.S. 57, 62. **U.S. v. Gilmore,** 372 U.S. 39, 45, to include expenses incurred in the production of income."

In referring to the code and its amendments relating to the deductibility of bad debt losses, the court in **Whipple** said at page 201 referring to the 1942 amendment: "It was designed to make full deductibility of a bad debt turn upon its proximate connection with activities which the tax **laws recognized as a trade or business, a concept which falls far short of reaching every income or profit-making activity.**" (emphasis supplied)

The taxpayer in **Whipple** was very active in many corporations in different ways but the court said at page 202: "When the only return is that of an investor, the taxpayer has not satisfied his burden of demonstrating that he is engaged in a trade or business since investing is not a trade or business and the return of the taxpayer, though substantially the product of his services, legally arises not from his own trade or business but from that of the corporation."

In like manner, Massachusetts General Laws, Chapter 62, Section 2(c)[8] allows a deduction for expenses and interest only when "effectively connected with the active conduct of a "trade or business" much the same as the bad debt loss in **Whipple** had to be connected with a business to qualify as an ordinary loss.

In **Forte Investment Fund v. State Tax Commission,** 369 Mass. 786 (1976), (Forte), the taxpayer was a Massachusetts trust with transferable shares and was engaged in investing in stocks, bonds and real estate for the benefit of its shareholders. It incurred expenses for officers' salaries, auditing and legal services, custodian and investment advisor fees and general expenses, collectively described as investment expenses. The Supreme Court affirmed the board's ruling that the taxpayer was not entitled to a deduction for the expenses because the taxpayer was not engaged in a "trade or business."

In **Forte,** supra, the court said at page 788-789: "We conclude that the taxpayer was not engaged in a 'trade or business'. Expenses incurred in making one's investments are not expenses incurred in a 'trade or business', as those words are used in the code. This principle was established in **Higgins v. Commissioner,** 312 U.S. 212, (1941) and has been adhered to since. **Whipple v. Commissioner,** 373 U.S. 193, 200 (1963) ... Although Congress has reversed the result of the Higgins case by the enactment of section 212 of the code, it did so by establishing a new and separate deduction and not by enlarging the definition of a 'trade or business'. We reject the taxpayer's argument that our opinions interpreting the words 'income subject to taxation' under G.L. c. 62, s.3, indicate that all expenses incurred by an individual in producing income are deductible."

Thus, it is apparent that up to this point our Supreme Court has consistently followed the principles and approaches we have analyzed in **Higgins** and **Whipple.**

However, in **Forte,** at page 789, our Court did say: "We express no opinion on the result in a situation where the taxpayer makes short-term investments designed to profit from fluctuation in a securities or commodities market as opposed to making investments for the purpose of

---

[7] This amendment now appears as I.R.C. s. 212.
[8] See Also G.L. c. 62, s. 2(d) incorporating I.R.C. s. 62(1) providing for "trade and business deductions."

profiting from the success of the enterprises in which the taxpayer has invested.''

In reaching its decision, the board considered this statement in determining whether appellant was a ''trader''.

While arguing that the investment activities of a trader amount to the conduct of a trade or business, appellant admits that it is a matter of factual analysis to be determined separately in each case whether the taxpayer is a trader. The appellant has provided the board with some general definitions which distinguish a trader from an investor.

However, the appellant's definition of ''trader'', cited with authority, appears in part to beg the question as to what the extent of the activities must be so that ''he may be said to be regularly engaged in such activities as a trade or business''. The definition refers to being ''actively and continuously occupied in the purchase and sale of securities, with his time and energy devoted to such work.'' As a test, this is of little or no help in the present appeal in the light of the evidence and of the cases we have cited and analyzed.

A Court of Claims case, **Levin v. United States,** 597, F. 2nd., 760 (1979), is cited by appellant and sets forth certain indicia for identifying a trader. These criteria include a determination of facts related to source of total income, time devoted to stock transactions, use of independent judgment and the quantity of transactions. Even admitting that the taxpayer approaches the line yet to be drawn by judicial demarcation between trader and investor, the board does not feel compelled to reach the same conclusion as the decision in **Levin** in this present appeal.

From the board's examination and analysis of Exhibits 5 and 6, looking at the totality of appellant's activities and not just the purchases and sales in 1975, the board was impressed by the fact that the appellant had been holding significant amounts of stock over long periods of time. Exhibit 5 is entitled ''Stock Held in 1975'' and consists of 23 pages but the headings of the columns vary, and the information given was confusing and incomplete. This was true, for example, as to the dates.

The board could not with any degree of reasonable certainty determine the nature of the appellant's activities as between trader and investor on the basis of Exhibit 5. While there is no doubt that much stock was sold after a short holding period, it appears that a significant amount of appellant's stock had been held for one or more years. Some shares had been held since 1966, for example, and there were some acquired in 1962 which appeared to be still held as is the case with some acquired in 1972 and earlier. The length of holding must be considered not merely with respect to the stock sold in 1975, but to appellant's other stock in the whole portfolio.

Furthermore, there is at least some question appellant could be found to be a trader absent evidence of the dates of sale of the stock in 1975. It is in his brief that appellant claims 52% of the sales were of stock held less than 6 months, and 63% held less than a year, etc. Allegations of fact in appellant's brief are not evidence. The board was unable to verify these claims or to determine the reasons why the appellant made the sales when he did and what his intentions were.

His tax return showed large loss carryovers. What part tax considerations, if any, played in timing sales is unknown. The appellant had a very large portfolio of stocks and in its management it would be normal for numerous transactions to occur within the year with some stock being sold after a short holding period. Such sales could have varying justifications; e.g., based on considerations of unexpected and sudden changes in the fortunes of the company, a change in the perceived desirability of the stock as such, bad judgment in the purchase in the first place, etc.

Without in any way attempting to fix with anything like precision any qualifying figures for a ''trader'' and

related to this problem, be they numbers of shares held, bought, sold, time of holding or any percentages, it seems to the board the appellant may well have been an investor. In any event, in the board's view, it was not required to rule as a matter of law that the appellant was engaged in a trade or business. In the board's opinion, the appellant failed to sustain his burden of proof that his activities did constitute a trade or business as that word was used in the code.

On the basis of the above findings, analysis of the facts and law, the board rendered its decision for the appellee.

Our decision was promulgated May 14, 1982.

**APPELLATE TAX BOARD**
**John P. Mulvihill Chairman**

A True Copy.

Attest: **Aldo Eanio 1st Assit. Clerk of the Board.**