FRANK E. DALEY & another[1] *vs.* STATE TAX COMMISSION.

Suffolk. November 6, 1978. — December 18, 1978.

Present: HENNESSEY, C.J., KAPLAN, WILKINS, LIACOS, & ABRAMS, JJ.

*Taxation,* Income tax. *Statute,* Construction. *Constitutional Law,* Taxation.

The provisions of G. L. c. 62, § 4, as applied to tax so much of a lump sum payment from an employees' trust established pursuant to a company's pension plan as came from post-1969 employer contributions at a 5% rate, while taxing the part deriving from the corresponding earlier employer contributions at 9%, violated art. 44 of the Amendments to the Constitution of the Commonwealth. [863-866]

APPEAL from a decision of the Appellate Tax Board.

*Peter J. Murphy,* Special Assistant Attorney General, for the State Tax Commission.

*Henry K. Mansfield (Virginia C. Hall* with him) for the taxpayers.

KAPLAN, J. When G. L. c. 62, our State income tax law, was rewritten in 1971 to impose a tax "in conformity with the Federal model" (*Ingraham* v. *State Tax Comm'n,* 368 Mass. 242, 247 [1975]), the possibility was created that at some fringe point the new law might collide with art. 44 of the Amendments to the Constitution of the Common-

---

[1] See note 4, *infra.*

wealth, the provision, having no counterpart in the Constitution of the United States, which commands a single rate of tax on income from any given "class" of property.[2] The present case involves such a collision.

Frank E. Daley, upon terminating his employment with the Cabot Corporation in 1972, received in that year a lump sum payment of $55,156.45 from an employees' trust established by the company pursuant to its pension plan.[3] In their joint Federal income tax return for 1972, Daley and his wife[4] treated $2,853.04 of the total as a nontaxable return of the employee's contributions under the plan; $6,720 as ordinary income; and the balance of $45,583.41 as long-term capital gain. The taxpayers about the same time filed a joint Massachusetts return for 1972 in which the two latter portions of the payment were treated as income taxable at a rate of 5%. The Commissioner of Corporations and Taxation assessed an additional income tax of $1,815.13, on the theory that the $45,-583.41 considered federally as a long-term capital gain was subject to Massachusetts tax at the rate of 9%.[5] The taxpayers paid the additional assessment, then filed an application for abatement, contending that by force of art. 44 the $45,583.41 as well as the $6,720 must be taxed at the rate of 5%. Upon denial of their application by the State Tax Commission, the taxpayers appealed to the Appellate Tax Board. On stipulated facts (in large part summarized above), the Board found for the taxpayers. In an opinion rendered in February, 1978, the Board construed the relevant provisions of G. L. c. 62 as subjecting

[2] The text of art. 44 is reproduced at note 10, infra.

[3] The trust itself was exempt from tax under §§ 401 (a), 501 (a) of the Internal Revenue Code of 1954, as amended.

[4] She has died since, and is represented in the present proceeding by her estate.

[5] The $1,815.13 included interest of $134.45. The Commissioner reduced the $6,726 portion, treated federally as ordinary income, by $2,853. It is agreed that this was an erroneous double exclusion of the amount of the employee's nontaxable contributions.

the $45,583.41 to a 5% rate of tax. This interpretation was plainly impelled by the Board's fears of offending otherwise against art. 44.

The taxpayers do not attempt to support the Board's interpretation of the statute, and we, too, think the interpretation is unsupportable (see note 8, *infra.*) But we also agree with the taxpayers that if the statute were applied according to its terms to impose the 9% tax, as the State Tax Commission proposed, it would to that extent violate art. 44.[6]

In adapting to the Federal Internal Revenue Code, G. L. c. 62, as appearing in St. 1971, c. 555, § 5, divided income into two categories: the first, taxable at 9%, included interest, dividends, and "net capital gain," defined as "the excess of the recognized gains over the recognized losses during the taxable year from sales or exchanges of capital assets or from other transactions deemed to be sales or exchanges of capital assets or granted gains treatment under the provisions of the [Federal] Code." § 4 (*a*) (3). The second category, taxable at 5%, included all other income (§ 4 [*b*]: "income subject to taxation, other than the income taxable under subsection [*a*]"). Here was an effort to conform to art. 44 by relating the rates of tax to income from different classes of property, and at the same time to promote uniformity between State and Federal taxation. Cf. First Interim Report of the Special Commission to Develop a Master Tax Plan, 1971 Senate Doc. No. 1298, at 23. But a vagary of the Federal scheme created a particular difficulty.

The Federal Code in the 1971 text, with effect for 1972, as a general rule taxed distributions from qualified employee benefit plans as ordinary income. § 402(a)(1). But there was an exception for lump sum retirement or death benefits under qualified plans: in certain circumstances

[6] There is no claim under the Constitution of the United States. See *Opinion of the Justices*, 266 Mass. 583 (1929) (answer to third question).

these were taxed in part as capital gains and in part as ordinary income. Thus ordinary income treatment was accorded such part of a lump sum retirement benefit as derived from post-1969 employer contributions (apparently represented in the $6,720 in the present case), whereas capital gains treatment was given to the benefits traced to pre-1970 employer contributions or traced to appreciation, dividends, or interest on any contributions whether by employer or employee (the $45,583.41 herein). § 402 (a) (2), (5). We indicate in the margin how the Federal law attained to these distinctions in the taxation of lump sum retirement distributions.[7] Such as they were, the distinctions were imported into the Massachusetts system by G. L. c. 62, § 4 (a) (3)—in particular by the language "transactions ... granted gains treatment under the provisions of the [Federal] Code." The additional assessment was faithful to this text of § 4 (a) (3).[8]

---

[7] Between 1942 and 1969 lump sum retirement and death benefits were taxed federally as long-term capital gains, apparently to soften the impact on taxpayers who were receiving large sums in one year. The pattern adopted in 1971, on the other hand, resulted from a feeling that capital gains treatment was unfair in allowing employees "to receive substantial amounts of what is in reality deferred compensation at more favorable tax rates than other compensation received for services." S. Rep. No. 91-552, 91st Cong., 1st Sess. 201 (1969). Thus "[i]nsofar as the distributions are considered as being attributable to post-1969 years, the portions of the benefits which represented employer contributions were accorded ordinary income treatment while the portions which represented appreciation, interest, or dividends on the amounts accumulated continued to be given capital gains treatment." H.R. Rep. No. 93-807, 93rd Cong., 2d Sess. (1974), p. 146, reprinted in [1974] U.S. Code Cong. & Ad. News 4670, 4811. This mode of taxation was itself changed in 1974. See id.; I.R.C. §§ 402 (a) (2), 402 (e) (4) (L). (Note that Federal capital gains treatment tended to reduce Federal tax while similar State classification tended to increase State tax.)

[8] The Appellate Tax Board, in attempting to avoid the constitutional question by reading G. L. c. 62, § 4, as disallowing the differing rates of tax, cited the Legislature's general purpose to give favorable tax consideration to qualified pension plans; inconsistent Commission rulings regarding taxation of lump sum distributions under such plans; and absence of indication that the Legislature intended to tax lump sum

The collision with art. 44 occurs in the attempt to tax so much of the lump sum payment as comes from the post-1969 employer contributions at a 5% rate, while taxing the part deriving from the corresponding earlier employer contributions at 9%. Giving the legislation the benefit of any constitutional doubt, and placing the burden of proving invalidity on the taxpayers, see *Barnes* v. *State Tax Comm'n,* 363 Mass. 589, 594 (1973), we are still unable to say that the fact that the contributions were made at different times can set them apart as different classes of property for art. 44 purposes.[9]

Article 44[10] affords the General Court broad power to levy a tax on incomes, short of a tax with different rates on income derived from the same class of property. The tax may be "at different rates upon income derived from different classes of property," but it must be at "a uniform rate throughout the commonwealth upon incomes derived from the same class of property."[11] The Legisla-

---

benefits at a higher rate than other distributions. But in our view the Board does not and cannot overcome the quite explicit language of § 4.

[9] The taxpayers would also contend that art. 44 is violated when periodic distributions on retirement are taxed at a different rate from lump sum distributions, but it is unnecessary to consider this more tenuous point.

[10] "Full power and authority are hereby given and granted to the general court to impose and levy a tax on income in the manner hereinafter provided. Such tax may be at different rates upon income derived from different classes of property, but shall be levied at a uniform rate throughout the commonwealth upon incomes derived from the same class of property. The general court may tax income not derived from property at a lower rate than income derived from property, and may grant reasonable exemptions and abatements. Any class of property the income from which is taxed under the provisions of this article may be exempted from the imposition and levying of proportional and reasonable assessments, rates and taxes as at present authorized by the constitution. This article shall not be construed to limit the power of the general court to impose and levy reasonable duties and excises."

[11] We have held that the word "property" appearing in art. 44 includes "the right to make contracts for labor and for personal service." *Raymer* v. *Tax Comm'r,* 239 Mass. 410, 413 (1921).

ture surely has a considerable range of discretion within the bounds of reason in defining or designating what are different classes, see *Opinion of the Justices,* 266 Mass. 583, 586 (1929); *Tax Comm'r* v. *Putnam,* 227 Mass. 522, 531 (1917), and it has similar liberty in establishing exemptions from the tax, see *Opinion of the Justices,* 270 Mass. 593 (1930); cf. *Opinion of the Justices,* 354 Mass. 792 (1968). Although differences in the rates set must reflect "actual underlying differences in the property"[12] giving rise to the income, the "nature of the business and incidents" may characterize a property and distinguish it from another. *Barnes* v. *State Tax Comm'n, supra* at 594. So also habitual practice or custom or history or other considerations may play their part in the delineation of classes. *Id.;* cf. *First Fed. Sav. & Loan Ass'n of Boston* v. *State Tax Comm'n,* 372 Mass. 478, 491 (1977), aff'd 437 U.S. 255 (1978). Quite clearly, as the taxpayers concede, the General Court could have drawn a line in the statute between increments on the contributions and the contributions themselves, with different rates applied to the portions of the lump sum payments to taxpayers deriving from the respective sources. The statute, however, went beyond the verge and took an impermissible line in its imitation or absorption of the particular feature of the then current Federal law. Thus we have no choice but to affirm the result reached by the Appellate Tax Board, although not on the ground taken by it.[13]

*Decision of the Appellate*
*Tax Board affirmed.*

---

[12] It is unnecessary for the present case to attempt to say how far the present income tax law is based on "property" conceptions, how far on ideas of "excise." See *Ingraham* v. *State Tax Comm'n,* 368 Mass. 242, 248 (1975).

[13] The State Commission does not contend that if the taxpayers succeed on their constitutional point there is any room under the statute for taxing any part of the lump sum payment herein at a rate of 9%.